IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA  :  CRIMINAL ACTON
                          :
            v.            :
                          :
SHAMEK HYNSON            :  NO. 05-576-2

## MEMORANDUM AND ORDER

**Juan R. Sánchez, J.,**                                    **September 11, 2007**

In this drug conspiracy and firearm distribution prosecution, I must decide whether to exclude Shamek Hynson's statements to police,[1] physical evidence seized from Hynson's person and apartment, photobooks witnesses used for identification, and his cell phone records.[2]  I must next decide whether to sever his case from co-defendants and the witness intimidation charges from the drug conspiracy and gun charges.  I must also decide whether Hynson's 2004 felony drug conviction[3] and his acts of wrong doing involving guns should be admitted against him at trial.[4]  For the reasons below, Hynson's motions to suppress and to sever are denied.  Except for Hynson's 2004 felony drug

---

[1] Hynson also moved to suppress statements he made to Government agents.  Because the Government is not seeking to admit these statements, the suppression motion as to this issue is moot.

[2] Hynson withdrew his motion to suppress the recordings of his phone calls from prison.  The recordings are admitted, mooting this issue.

[3] The Government also moves to admit Hynson's prior robbery, escape, and manslaughter convictions for impeachment purposes if Hynson testifies during trial.  I reserve ruling for when Hynson testifies.

[4] The Government also moved to admit taped recordings of Hynson's telephone conversations with Talonda Williams.  *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975).  Hynson does not oppose the motion.  The telephone recordings are admitted.

The Government also moved to admit further evidence against Hynson in a supplemental 404(b) Motion *in Limine*.  I will address that evidence in a separate order.

1

conviction, which is excluded, the Government's motion *in limine* is granted.

 **FINDINGS OF FACTS**

1.     On December 8, 2004, around 8:00 am, Oneida County New York officers and Investigator

       Michael Ladd, who at that time had 20 years of experience with the Oneida County Sheriff's

       Office, were looking for Shamek Hynson in the area surrounding Lansing Street in Utica,

       New York.  Hynson was wanted for seven outstanding warrants from South Carolina and

       was known to be armed and dangerous.  Investigator Ladd and the other officers were also

       provided with a picture of Hynson.

2.     Investigator Ladd and other members of the United States Marshal Service Central New

       York Fugitive Task Force continued surveillance until 11:30 a.m. when they saw Hynson.

       He was walking on Lansing Street toward Third Avenue.

3.     Investigator Ladd and his surveillance team saw Hynson enter a corner store at the

       intersection of Blandina and Lansing Streets.  The team parked their car and entered the

       convenience store.

4.     Upon approaching Hynson inside the convenience store, the task force members identified

       themselves as police officers, and asked Hynson if he was "Raymond Torres."[5] Hynson

       responded he was "Donovan Delano."  Investigator Ladd, then, asked Hynson to accompany

       him out to the car, while handcuffing him.

5.     After handcuffing Hynson, Investigator Ladd frisked and searched Hynson for officer safety

       and seized $347, a Verizon cell phone, and a set of keys with a tag reading "705 Lansing

---

[5] Investigator Ladd explained he approached Hynson pretending to look for"Raymond Torres," so
Hynson would identify himself.

2

Street."

6.   After Hynson was in custody, Deputy United States Marshals Chris Amoia, who at the time
     had worked for the Central New York Fugitive Task Force for 11 years, went to 705 Lansing
     Street.  The South Carolina U.S. Marshal office had informed Deputy Amoia that Hynson
     was probably accompanied by Shanika Wilson, who also had some outstanding warrants in
     South Carolina.  Deputy Amoia and his office were also warned Hynson was involved in
     narcotics, armed and dangerous, and known for always carrying a firearm.

7.   Deputy Amoia, with about three deputies, arrived at 705 Lansing Street.  Deputy Amoia
     knocked on the door, and a young woman answered.  All the deputies, without drawing any
     firearms, identified themselves as police, and informed the woman they wanted to talk about
     Shamek Hynson.  She, then, allowed them to enter the apartment.

8.   The woman identified herself as Tamika Brown, but was unable to produce identification.
     They all continued their discussion in the crowded kitchen.  Deputy Amoia asked the woman
     who else lived there, and the woman answered Renee Williams and Shamek Hynson.  The
     woman said she and Hynson had each made rent payments of $650.00 during the couple of
     months they had lived there.

9.   During the conversation, the woman admitted she was Shanika Wilson.  Deputy Amoia, then,
     read Wilson her *Miranda* rights. She then acknowledged, understood, and verbally waived
     these rights.

10.  After Wilson waived her *Miranda* rights, Deputy Amoia asked Wilson for consent to search
     the apartment. He  reviewed the  U.S. Marshal's Consent to Search Form with Wilson.  This
     consent form outlined in three simple paragraphs Wilson's constitutional right to refuse

3

consent and then described the area the marshals would search upon consent. Wilson agreed

to the search, and signed an official United States Marshals Consent to Search Form.  The

U.S. Marshals were polite and courteous during their discussion with Wilson.  No threats,

coercion, or intimidation were used to secure Wilson's consent to search the apartment.

11.     After Wilson had signed the Consent to Search form, the marshals searched the bedroom

Wilson shared with Hynson.  In this bedroom, the marshals found a large camouflage

military-type hat containing what appeared to be several bags of chunky white substance.

They immediately stopped their search and contacted the Oneida County Drug Task Force

for a search warrant.

12.     At the Oneida County Drug Task Force department, Investigator Gerald Azzarito, who had

worked with the City of Utica Police Department since 1989, prepared the search warrant

based on this chunky white substance.  Investigator Azzarito took the warrant to Utica City

Court Judge John Balzano for approval.  After Judge Balzano's approval, Investigator

Azzarito and several other officers arrived at 705 Lansing Street to execute the warrant.

During the execution, law enforcement seized drugs, drug distribution paraphernalia, guns,

ammunition, receipts, and money.[6]

13.     Detective Michael Winters, a detective in Lancaster Pennsylvania Police Department's

Violent Crime Unit, also assisted in the Hynson and Prince Isaac investigation.  Detective

---

[6] Specifically, law enforcement seized the following: 61 bags of an off-white chunky substance in a Converse sweatshirt; picture of Hynson wearing the exact same Converse sweatshirt; six sandwich bags; off white chunky substance found in various zip lock; scales; drug packaging materials; strainer; 1 Smith & Wesson, Model SW.40 VE-PBP 4133 caliber semiautomatic pistol, with one magazine containing ten nine live rounds of .40 caliber ammunition; 1 Intratec Model TEC22 .22 caliber semiautomatic pistol, serial no. 80297; box of 20 rounds of .40 caliber ammunition; two Western Union receipts, and $2,244 in U.S. currency.

Winters, who at the time had been a police officer for eight years and a detective for three, prepared one photobook used to identify Hynson and his co-defendants. Detective Winters obtained arrest and driver license pictures of individuals named during the Hynson and Isaac investigation. These individuals were very diverse, encompassing both genders and various races and ages. Some depicted individuals shared the same race and a similar complexion and age as Hynson. Detective Winters then numbered these pictures and placed them in a large three ring binder. He also provided the Government with pictures for its two photobooks used in this investigation.

14.   Detective Winters would ask witnesses to come down to the police station and flip through the photobook he prepared. While they were examining the photobook, he would ask them to identify anyone they knew. Detective Winters would similarly ask Government witnesses to examine both books and identify anyone they knew. Witnesses were not asked to specifically identify Hynson or any other co-defendant.

15.   Detective Winters's photobook contained pictures of 50 people, 35 men and 15 women; all of various ages and races. One of the other U.S. attorney books contained 18 people of various ages and races, 13 men and six women. Nothing in the photobooks nor the interviewing procedure were unnecessarily suggestive as to create a substantial risk of misidentification.

**DISCUSSION**

Hynson seeks to suppress statements and physical evidence including two different amounts of money, a cell phone, keys, drugs, drug distribution paraphernalia, guns, ammunition, and receipts. Hynson's statement he was "Donovan Delano" is admissible because he was not in custody when

5

making this statement.  *Miranda* only applies to custodial interrogation and precludes any resulting self-incriminating statements.  *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).  In deciding whether a person is in custody, courts consider the following: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the interrogation's location or physical surroundings; (3) the interrogation's length; (4) the use of coercive tactics including hostile voice tones, displaying weapons, or physically restraining suspect; and (5) "whether the suspect voluntarily submitted to questioning."  *United States v. Willaman*, 437 F.3d 354, 359 -60 (3d Cir. 2006) (internal citations omitted).  Investigator Ladd had not stated whether Hynson was under arrest or free to leave when Hynson identified himself as "Donovan Delano."  The location, manner, and length of the encounter, however, indicate Hynson was not in custody when he made this statement.  When Investigator Ladd asked Hynson for his identity, Hynson was at a convenience store in Utica, New York.  He was not in a police car, a police station, nor an interrogation room.  Hynson was also not in handcuffs, nor was he physically restrained from leaving Investigator Ladd or the other officers' presence.  He was free to leave.  The record fails to show Investigator Ladd used a hostile tone or any other coercive tactic when Hynson said he was "Donovan Delano."  Because Hynson was not in custody, *Miranda* does not apply and his identification of himself as "Donovan Delano" is admissible.

I now address the money, cell phone, and keys seized from Hynson's person.  Searches incident to arrest are permitted  "to disarm the suspect in order to take him into custody, and [t]o preserve evidence for later use at trial."  *Knowles v. Iowa*, 525 U.S. 113, 116 (1998).  As long as the arrest was lawful, the search incident to the arrest within the appropriate vicinity is also lawful.  In this case, Investigator Ladd arrested Hynson pursuant to seven outstanding warrants from South Carolina.  He also knew Hynson was armed and dangerous.  Investigator Ladd searched Hynson's

person and seized $347, a Verizon cell phone, and keys with a tag reading "705 Lansing Street." This money, cell phone, and keys are admissible against Hynson at trial because his arrest and subsequent search were lawful. *United States v. Myers*, 308 F.3d 251 (3d Cir. 2002); *Chimel v. California*, 395 U.S. 752, 762-63 (1969) (search incident to arrest includes the defendant's person).

Hynson also seeks to suppress the drugs, drug distribution paraphernalia, guns, ammunition, receipts, and money seized from his apartment in Utica, New York. To resolve this issue, I must decide whether Wilson's consent to search the apartment, which provided the probable cause for the search warrant, was voluntary. Law enforcement can search a residence without a warrant with voluntary consent from a person with authority. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227-28 (1973); *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994). Voluntary consent requires a "product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It also requires me to examine the totality of the circumstances and the maturity, level of education, physical condition, mental health, age, of the consenting individual. *Id.*; *Bustamonte*, 412 U.S. at 228-29 (adopting *Miranda* voluntariness standard). A warrant and its seized items are lawful if based on probable cause obtained through lawful means. *Contra Alderman v. United States*, 394 U.S. 165, 171 (1969) (discussing exclusionary rule which excludes fruits of illegal searches).

Here, the record demonstrates Wilson's consent was voluntary, and not a product of threat, coercion, or force. Wilson, who was 21 at the time of the search, permitted the marshals to enter, and they then engaged in a professional conversation regarding Hynson.[7] The marshals asked her

---

[7] No evidence nor argument has been presented to challenge Wilson's age, maturity, level of education, physical condition, or mental health. I will then only examine the totality of the circumstances surrounding Wilson's consent.

questions in a non-hostile or coercive tone, and Wilson answered them without hesitation. Even though a discussion with four marshals in confined kitchen could be considered intimidating, Wilson chose to continue discussing Hynson with the marshals. At no point during this discussion did Wilson inform the marshals she felt intimidated , threatened, or that she wanted the discussion to end.

When Wilson identified herself, the same woman who had outstanding warrants from South Carolina, Deputy Amoia read her *Miranda* rights, and she verbally waived them. He then asked for consent to search the apartment and explained it using the U.S. marshals consent to search form. This form outlined in three simple short paragraphs Wilson's constitutional right to refuse the search and her consent for the marshals to search her apartment on 705 Lansing Avenue, Utica, New York. After reviewing this form, Wilson could have exercised her constitutional right to refuse, but Wilson chose to consent to the search and then chose to sign her name in the consent form. No one raised his voice, used force, or brandished his weapons to coerce Wilson to consent.

Her consent was voluntary, thus, U.S. marshals permissibly entered Hynson's apartment on December 8, 2004. They then lawfully saw the chunky white substance in Wilson's and Hynson's bedroom, and used this to obtain the search warrant for the apartment. The drugs, drug distribution paraphernalia, guns, ammunition, receipts, and money seized through that search warrant are admissible.

I next turn to Hynson's motion to suppress the photobooks witnesses used to identify him. In order to successfully admit photo identification, the Government must prove by a preponderance of the evidence the photo identification and interviewing process were not "unnecessarily suggestive as to create a substantial risk of misidentification." *United States v. Emanuel*, 51 F.3d 1123, 1127

(3d Cir. 1995); *United States v. Barr*, 454 F. Supp. 2d 229, 250 -51 (E.D. Pa. 2006).  Courts also must examine the interviewing procedure during these photo identifications.  *See United States v. Smith*, 127 Fed. Appx. 608 (3d Cir. 2005); *United States v. Brownlee*, 454 F.3d 131 (3rd Cir. 2006).

After examining the photobooks and listening to Detective Winters's testimony, the Government has proven by a preponderance of the evidence the contested photobooks and interviewing procedures were not unnecessarily suggestive as to create a substantial risk of misidentification.  The first book contained pictures of 50 people, 35 men and 15 women.  The depicted people were of various ages and races including African American males in similar age and complexion as Hynson.  The second book contained 18 people of various ages and races, 13 men and six women.  Hynson's mugshot-type picture is blurry and similar in quality as to a majority of the other pictures.  Nothing in Hynson's picture nor in photobooks' lay out is unnecessarily suggestive as to create a substantial risk of misidentifying him as involved in illegal drug and firearm activity.

There is also nothing unnecessarily suggestive in Detective Winters's interviewing procedure.  Detective Winters asked different individuals to come in, view the photobooks, and identify anyone they recognized.  He did not ask them to specifically look for Shamek Hynson, nor did he interrogate them afterwards if they were unable to identify Hynson.  Based on his testimony and the evidence presented, nothing in the interviewing procedure was unnecessarily suggestive as to create a substantial risk of misidentifying Hynson.  *See United States v. London*, 39 Fed. Appx. 758 (3d Cir. 2002); *United States v. Mathis*, 264 F.3d 321 (3d Cir. 2001).  *Cf. United States v. Barr*, 454 F. Supp. 2d 229, 250-51 (E.D. Pa. 2006) (finding photo identification could have been unnecessarily suggestive).

Hynson next seeks to suppress his phone records obtained from the cell phone companies.

9

The Fourth Amendment applies only when an individual has an actual and reasonable expectation of privacy.  *See Katz v. United States*, 389 U.S. 347, 360-61 (1967) (requiring subjective and objective analysis to determine expectation of privacy).  There is no reasonable expectation of privacy for the phone numbers one dials.  *Smith v. Maryland*, 442 U.S. 735, 742-43 (1979).  Here, Hynson baselessly argues law enforcement needed a warrant to obtain his phone records from the cell phone companies.  Because Hynson did not have a reasonable expectation of privacy for the phone numbers he dialed, the Fourth Amendment and its requirements are inapplicable.  *Id.* Law enforcement did not need to obtain a warrant prior to obtaining Hynson's phone records from the cell phone companies.[8]  Hynson's cell phone records obtained from relevant cell phone companies are admitted.

I next consider Hynson's motions to sever co-defendants and offenses.  Severance of co-defendants can only be granted if joint trial would compromise a defendant's trial rights.  Fed. R. Crim. P. 14; *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  In considering severance of co-defendants, Federal Rule of Criminal Procedure 14[9] allows for severance only pending a serious risk

---

[8] Hynson also argues the "subpoena was overbroad" and part of the Government's "fishing expedition."  Hynson's Mot. to Suppress [7-8].  Given the fact a warrant was not needed to obtain the cell phone records, Hynson's argument of overbreadth lacks merit.

[9] Rule 14 reads:

> (a) Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

> (b) Defendant's Statements. Before ruling on a defendant's motion to sever, the court may order an attorney for the government to deliver to the court for in camera inspection any defendant's statement that the government intends to use as evidence.

that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence. *Zafiro*, 506 U.S. at 539. A serious danger which threatens to compromise a defendant's trial rights and would justify severance might occur in: (1) a complex, multi-defendant case with markedly different degrees of culpability; (2) a case where evidence is admissible only against one defendant; or (3) a case where evidence which exculpates one defendant is unavailable in a joint trial, e.g., where one defendant will call the other defendant as a witness. *Id.* The Third Circuit has held since *Zafiro*, claims based on mutually antagonistic defenses have usually been found insufficient to warrant severance without a strong showing that such specific rights were impaired. *See, e.g., United States v. Balter*, 91 F.3d 427 (3d Cir. 1996); *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992). Also, "finger-pointing and blame-shifting among coconspirators" does not justify separate trials. *United States v. Voight*, 89 F.3d 1050, 1095 (3d Cir. 1996) (citing *United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994) (affirming trial court's denial of severance when co-conspirators denied any wrongdoing by blaming the other because jury could have believed both defenses and acquitted both)). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro*, 506 U.S. at 537. Further, defendants must show the prejudice to be more than just a greater likelihood of acquittal if tried alone. *Id.* at 539. Even if the defenses are mutually antagonistic, I can exercise my discretion to tailor the relief to be granted. *Id.* at 534-39.

Hynson has failed to show a serious risk a joint trial would compromise his specific trial rights or prevent the jury from making a reliable judgment about guilt or innocence. Hynson argues the other defendants' potential testimony against him and the high complexity of this drug case prove

---

Fed. R. Crim. P. 14

prejudice.  Blame shifting or mutually antagonistic defenses, however, are not enough to sever from the other defendants.  *Voight*, 89 F.3d at 1095.  As to other defendants testifying against him, some of these defendants are available to the Government under their cooperating agreement to testify against him during a separate trial.  Hynson would still have to defend against incriminating testimony from his co-defendants in a separate trial.  I can redact any confessions incriminating Hynson and also provide the jury with adequate limiting instructions to remedy Hynson's concerns.  *Zafiro*, 506 U.S. at 539; *see also Bruton v. United States,* 391 U.S. 123, 133-35 (1968) (redacting section of one defendant's confession that incriminated the second defendant).  Hynson has failed to articulate or demonstrate how a limiting instruction or redaction would not adequately address any resulting prejudice.  Overall, Hynson has failed to prove prejudice and persuade me to grant his motion to sever from his co-defendants.

Hynson also argues I should sever the witness intimidation counts in the second superseding indictment because the counts do not arise from the same set of acts as the drug and firearm counts.  Hynson baldly asserts this joinder would prevent the jury from fairly evaluating either set of facts.  I disagree.   Offenses arising from the common act or series of conduct are properly joined and should not be severed.  *See United States v. Eufrasio*, 935 F.2d 553, 570 (3d Cir. 1991).  Federal Rule of Criminal Procedure 8(a) and (b)[10] "permit [j]oinder of offenses and defendants, respectively,

---

[10] Rule 8 reads:

> (a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> (b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series

when a transactional nexus exists between the offenses or defendants to be joined." *Eufrasio*, 935 F.2d at 570.   When evaluating either joinder of offenses or defendants, courts focus on whether the offenses or defendants arise out of a common series of acts or transactions.  *Id.*

Hynson agues  the witness intimidation charges "insulates the government's witnesses from attacks on their credibility" and should be severed.   Def. Hynson's Mot. for Severance [3]. Regardless of the alleged insulation, the witness intimidation counts arose from a common series of acts closely connected to the drug conspiracy and firearm counts.  Hynson's acts of intimidation were motivated by his desire to prevent the witnesses from testifying against him in the pending drug conspiracy and firearms case.  The witnesses Hynson allegedly intimidated were scheduled to testify against Hynson in this drug conspiracy and firearm trial.  Under Federal Rule of Criminal Procedure 8, joinder of these offenses is not only required but proper.  Thus, Hynson has also failed to show the resulting prejudice from joinder of the witness intimidation and drug and firearm counts. Morever, the witness intimidation charges would also be admissible as evidence of Hynson's consciousness of guilt for the drug conspiracy and firearm charges.  *See United States v. Tyler*, 2003 WL 22016883, at *5 (E.D. Pa. June 19, 2003) (finding defendant's cover-up actions were appropriately related and demonstrated consciousness of guilt) .

I will now consider the Government's motion to admit evidence of Hynson's prior conviction and several acts of wrong doing involving guns.  Under Rule 404(b), Hynson's 2004 felony drug conviction cannot be admitted to show or prove defendant's character or predisposition to commit

---

of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8.

crime.  Fed. R. Evid. 404(b).  This conviction, however, can be admitted for "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  *Id.* In deciding whether to admit Hynson's felony drug conviction, I must conduct a careful analysis under the four-part test announced in *Huddleston v. United States*, 485 U.S. 681 (1988).

In *Huddleston*, the Supreme Court directed trial courts to consider whether the 404(b) evidence: 1) has a proper purpose; 2) is relevant under Fed. R. Evid. 401; "3) its probative value must outweigh its potential for unfair prejudice; and 4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted."  *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003) (citing *Huddleston ,* 485 U.S. at 691-92 ; *United States v. Vega*, 285 F.3d 256, 261 (3d Cir. 2002)).  The Government  "must clearly articulate how that evidence fits into a chain of logical inferences," none of which can lead to the character inference.  *United States v. Sampson*, 980 F.2d 882, 888 (3d Cir. 1992).  I must then evaluate the Government's proffered reasons in the *Huddleston* test and provide a clear explanation "articulat[ing] reasons why the evidence also goes to show something other than character."  *Id.*; *United States v. Murray*, 103 F.3d 310, 316 (3d Cir. 1997).

Hynson's 2004 felony drug conviction can be used to show knowledge of drug distribution and is relevant.  This conviction refutes any defense of mistake and assists the in jury more accurately deciding Hynson's intent and knowledge in the current drug conspiracy charges.  It is also relevant under Rule 401[11] because it makes his knowledge of drug distribution and packaging more probable than it would be without the 2004 conviction.  Thus, *Huddleston*'s first two prongs are

---

[11] Relevance is defined as "evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

14

satisfied.

In determining *Huddleston*'s third prong, however, I must evaluate whether the probative value of Hynson's 2004 felony drug conviction outweighs its prejudicial value.  In this evaluation, I consider "the genuine need for the evidence" against the chance of improperly "influenc[ing] the jury to convict."  *United States v. Barnes*, 2005 WL 2994698, *5  (E.D. Pa. Aug 16, 2005) (citing *United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir.1988)).  "Contested issues and other evidence and the strength of the evidence in proving the issue," assist in evaluating the need for evidence. *United States v. Sriyuth*, 98 F.3d 739, 748 (3d Cir.1996) (quoting *United States v. Cook*, 538 F.2d 1000, 1003 (3d Cir.1976)).

In its case against Hynson, the Government has prepared two weeks' worth of evidence through numerous exhibits and witnesses, who were intimately linked to Hynson and his alleged drug conspiracy and firearm charges.  Specifically, the Government is expected to present physical evidence such as alleged profits from the drug conspiracy and the drugs and firearms allegedly used in furtherance of the conspiracy.  Government witnesses are expected to testify Hynson directed them to package and sell heroin and cocaine in furtherance of this conspiracy.  Other Government witnesses, who were intimately related to Hynson and this conspiracy, will testify how they purchased firearms for Hynson's and Isaac's 50 Million Soldiers drug operation to protect the profits from drug sales and from rival groups.  The evidence against Hynson in this drug conspiracy prosecution is compelling.  Hynson's 2004 felony drug conviction adds minimal value to the Government's case, but improperly influences the jury to convict him for the pending charges.  There would be an extreme risk of the jury convicting him given this felony drug conviction occurred the same year he allegedly committed this federal prosecution's charges.

Although I could give a limiting jury instruction, the danger still exists the jury would convict Hynson based on his 2004 felony drug conviction.  Balancing the strength of the Government's case against the risk Hynson's felony drug conviction would influence the jury to convict leads me to exclude Hynson's 2004 conviction.

Lastly, I will address Hynson's acts of wrong doing involving guns.  The indictment charges Hynson used straw purchases to acquire loaded firearms and then regularly carried them: 1) to collect drug debts; 2) fight off rival drug dealers; and 3) to protect and retaliate against other gangs.  Hynson's repeated possession of firearms would prove this indicted conduct.  Federal Rule of Evidence 404(b) applies to prior bad acts, but it does not apply to intrinsic acts.  "[A]cts are intrinsic when they directly prove the charged conspiracy." *United States v. Jenkins*, 188 Fed. Appx. 94, 95 (3d Cir. 2006) (citing *United States v. Cross*, 308 F.3d 308, 320 (3d Cir. 2002)).  This type of evidence is offered as "direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused." *United States v. Gibbs*, 190 F.3d 188, 216-18 (3d Cir. 1999).  While such proof could be substantially prejudicial, "the court would have no discretion to exclude it because it is proof of the ultimate issue in the case." *Id.* (citing 22 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239, at 450-51 (1978)).

Evidence of Hynson carrying and possessing firearms is also direct evidence of the current drug and firearms charges.  Government witnesses will testify Hynson carried and possessed firearms to protect and retaliate against other gangs, fight off rival drug dealers, or to collect drug debts.  Hynson's possession of a firearm on October 18, 2004 linked to the Edward Cameron shooting is also direct evidence of his alleged use of a firearm to settle such a drug debt.  18 U.S.C. § 924(c)(using and carrying a firearm during commission of a drug trafficking crime).  Government

16

witnesses will also testify Hynson's repeated trips "down south,"were used to straw purchase firearms to protect and further his alleged drug operation in Lancaster, Pennsylvania.  Evidence of the repeated possession of firearms, possession of Edward Cameron firearm, and repeated trips "down south" done in furtherance of the drug conspiracy in Lancaster, Pennsylvania are admissible against Hynson at trial.

**CONCLUSIONS OF LAW**

1.     Hynson's false identification as "Donovan Delano" is admissible as a statement made outside of custody, not needing *Miranda* warnings.

2.     The $347, Verizon cell phone, and keys seized from Hynson's person is admissible as evidence seized incident to a lawful arrest pursuant to seven outstanding warrants from South Carolina.

3.     The money, drugs, firearms, and receipts seized through the search warrant of Hynson's and Wilson's apartment are admissible because Wilson voluntarily consented to a law enforcement search, which provided the probable cause for the search warrant.

4.     The photobooks are admissible because neither the photobooks, nor the interviewing procedure were unnecessarily suggestive as to create a substantial risk of misidentification.

5.     Hynson's cell phone records obtained from cell phone companies are admissible because Hynson lacks a reasonable expectation of privacy over the phone numbers he dials, eliminating the need for a warrant.

6.     Hynson's case is properly joined with the other co-defendants because he has failed to show a joint trial would compromise his trial rights or prevent a jury from making a reasonable judgment about guilt or innocence.

7.      The witness intimidation charges arose from a common series of acts or transaction with the drug and firearm charges.  All of these charges are properly joined for trial under Federal Rule of Criminal Procedure 8.

8.      Hynson's 2004 felony drug conviction is inadmissible because its prejudicial value outweighs its probative value.

9.      Hynson's October 18, 2004 possession of the firearm used in Edward Cameron's shooting is admissible as an intrinsic act and direct evidence of the alleged drug conspiracy.

10.     Hynson's repeated trips down south and possession of firearms in Pennsylvania, New York, North Carolina, and South Carolina are admissible to the extent the evidence directly proves the alleged drug conspiracy in Lancaster, Pennsylvania.

Accordingly, I enter the following:

## **ORDER**

_____And NOW this 11th day of September, 2007, Defendant Hynson's Motions to Suppress (Docket 99) and to Sever Co-Defendants (Docket 126) and Counts (Docket 177) are DENIED.  The Government's Motion *In Limine* (Docket 132) is GRANTED in part and DENIED in part.  The Government's Motion is granted as follows: 1) repeated possession of firearms; 2) October 18, 2004 possession of Edward Cameron shooting firearm; and 3) repeated trips "down south" are admitted.  The Government's motion to admit tape recordings (Docket 178) is GRANTED without opposition.

BY THE COURT:


_____/s/JUAN R. SÁNCHEZ, J.___
JUAN R. SÁNCHEZ, J.

18